# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

TOLTON GIBSON                                                                    PLAINTIFF

v.                              CASE NO. 5:15-CV-00386 BSM

GRAPHIC PACKAGING
INTERNATIONAL, INC., et al.                                        DEFENDANTS

## ORDER

Defendants' motions for summary judgment [Doc. No. 94, 97] are granted on plaintiff

Tolton Gibson's hostile work environment and retaliation claims, and denied on Gibson's

race discrimination claim.

## I.  BACKGROUND

Gibson is a black man who began working for Mid-America Packaging in 2006.  Pl.'s

Resp. Opp. Mondi's Facts ("Pl.'s Mondi Facts") ¶¶ 1-2, Doc. No. 109.  Mid-America's

bagging operation was purchased by defendant Graphic Packaging in 2010.  *Id.* ¶ 3.  Gibson

was terminated in 2012, and defendant Mondi Bags purchased the facility in 2014.  *See id.*

¶¶ 4, 6.

Gibson brought this suit against Graphic Packaging and Mondi Bags alleging his

termination was due to racial discrimination and retaliation.  He alleges he worked primarily

on one of three bagging machines and that each machine was staffed by three employees: (1)

machine operator, (2) helper/trainee, and (3) quality inspector.  Gibson Dep. 46:7–46:17,

Doc. No. 96; Pl.'s Resp. Opp. Graphic Packaging's Facts ("Pl.'s Graphic Facts") ¶ 18[1], Doc. No. 106.

The three-person teams worked in either eight-hour or twelve-hour shifts. Pl.'s Graphic Facts ¶ 19. A labor agreement provided that employees working more than eight hours in a day received additional overtime compensation. Therefore, staff scheduled for a twelve-hour shift were known to be working on "overtime machines." Gibson Dep. 76:19-76:21; Pl.'s Graphic Facts ¶ 7. A staff member scheduled to work a certain shift does not mean he or she actually worked those hours. *See, e.g.,* Gibson Dep. 45:1–45:5 (machines selected for overtime use varied). For example, Gibson was once asked to move from an eight-hour shift to a twelve-hour shift to cover for another person who was ill. *See, e.g., id.* 76:4–77:11.

As far as the racial makeup of these shifts, the eight and twelve hour shifts varied. The eight-hour machines were routinely operated by black employees, while the twelve-hour machines were operated by black and white employees. *Id.* 119:9–120:11. There were at least two black helper/trainees who worked on the overtime machines: Luther Dean and Alvin Armour. *Id.* 47:12–47:18.

A.    Staff Schedules

Machine operators were scheduled to shifts based on seniority. Nason Decl. ¶ 9, Doc.

---

[1] Gibson has apparently misnumbered or omitted statements from his response to Graphic Packaging's undisputed facts. For example, paragraph 18 in his response is actually paragraph 16 in Graphic Packaging's facts. *Compare* Doc. No. 106 *with* Doc. No. 99. Whenever possible, reference is made to Gibson's responses.

No. 97-5; Pl.'s Facts ¶ 28; Am. Ans. ¶ 29, Doc. No. 80.  Gibson refers to this seniority system as "lines of progression" as if the eight-hour shifts and the twelve-hour shifts had separate seniority rankings.  There is no evidence, however, to support that conclusion, as Gibson cites to an exhibit with only one list of employees showing only one line of progression for the facility.  *See, e.g.,* Doc. No. 105-2 at 14–15.  Indeed, the gravamen of Gibson's complaint is that his seniority trumped that of other workers for all shifts.  And, although Gibson's theory that the facility had separate lines or progression has been considered, his framing of the record cannot be accepted without referencing admissible evidence to support it.  *See Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."), *cert denied*, 475 U.S. 1013 (1986).

Despite Gibson's position that there were separate lines of progression, the undisputed facts in the record show that there were three types of seniority: (1) plant-wide seniority based on time of hire at the facility; (2) departmental seniority based on the date of hire within the department, and (3) job assignment based on time spent in a particular job classification.  Am. Compl. ¶ 30, Doc. No. 77; Am. Ans. ¶ 30.

Ken Nason, someone Gibson regarded as a supervisor, scheduled the hourly employees.  At the time of scheduling, Nason would not always know which machines would run eight hours or twelve hours.  Although these schedules were set and posted for staff to

view, they were not set in stone. For example, an additional order could require employees who were initially scheduled on an eight hour machine to work a twelve hour shift. Nason Decl. ¶¶ 2–7; Pl.'s Graphic Facts ¶¶ 20–21.

Gibson denies this background by explaining that "If [Nason] were not doing the scheduling, then it would have been Greg Yegohian since Ken Nason admits that he went to Yeghoian when he made adjustments to the schedules[.]" Pl.'s Graphic's Facts ¶ 20. As Gibson routinely does in his response to defendants' motions for summary judgment, he argues that defendants' statements of undisputed fact are disputed but provides no proof disputing those statements. For instance, Gibson denies defendants' statement that Nason did not know which machines would run eight or twelve hours by stating "Nason was able to adjust the schedules[,]" while citing to Gibson's deposition. That deposition, however, only establishes that (a) Gibson received a work schedule and informed Nason that Gibson should have received overtime and (b) that the schedules came out on Thursdays. Similarly, Gibson denied that employees could swap hours after they were scheduled by providing explanations for why employees might do so. Pl.'s Graphic Facts ¶ 26. Gibson's denials without referencing the record do not transform undisputed facts into disputed ones.

In 2009, Gibson began complaining that he was not receiving overtime hours. He visited with Nason and argued that his seniority qualified him to receive overtime hours before others. Gibson Dep. 28:7–28:10. Gibson also informed Alvin Armour, a union representative at the facility, who told Gibson to go through the proper channels. *Id.*

23:5–24:8.   In addition to Nason and Armour, Gibson complained about not receiving overtime to Lisa Hankins, the human resources official, and Bill Eubanks, the union's grievance chairperson.  *Id.* 23:5–24:8; 34:11–34:25.  Gibson noticed that he would usually be scheduled to work overtime in the week after he lodged a complaint.  *Id.* 35:1–35:4.

In 2009, Gibson noticed that the facility "started getting Caucasians in the department" that affected his overtime hours.  *Id.* 31:21–31:23.  For example, the facility hired Craig McGath, a white man, who was placed on twelve-hour shifts while Gibson received eight-hour shifts.  *See* Pl.'s Graphic Facts ¶ 27.  Similarly, Brandon Braswell, a white man, was hired in 2012, and Bradwell received twelve-hour shifts before Gibson. Gibson does not know, however, whether employees scheduled for twelve-hour machines actually worked those twelve hours and received overtime, but he assumed they earned those hours and received the overtime pay.   Gibson Dep. 32:8–32:24.   For example, despite Gibson's observations that Braswell received overtime shifts before Gibson, pay records show that Gibson actually worked more overtime than Braswell in 2012.  *See* Doc. No. 97-9 at 3–4 (showing that, as of December 2, 2012, Braswell had worked 89.65 overtime hours and Gibson had worked 339.86 overtime hours).

### B.   Specific Incidents with Other Employees and Termination

In addition to his complaints about not receiving overtime, Gibson complained of a "hostile work environment."  In February 2012, Gibson had an altercation with a co-worker, Jesse Stinnett.  Stinnett, who was working as a lead-person, instructed Gibson to bale waste

– an instruction Gibson refused because he believed the instruction was improper. Stinnett threatened to terminate Gibson. The dispute became heated and John Compton, a black man, had to pull Stinnett away. Gibson Dep. 123:10–123:14.

Gibson reported this incident to Hankins as a "hostile working environment" because Stinnett overreacted. *Id.* 38:8–38:10; 123:17–123:24. Gibson described how Stinnett approached Gibson in an "argumentative fashion," and Gibson "informed" Hankins that if he had approached Stinnett in that manner, Gibson would have been terminated because Gibson is black and Stinnett is white. *Id.* 40:19–40:23. Gibson believes that Stinnett's actions were racially motivated due to Stinnett's "mannerism[s]." *Id.* 41:25–43:17. When asked about this conclusion, Gibson stated "I just feel that his whole attitude that evening was geared towards me, specifically, because he took it upon himself to confront me about something that I had no control over. His – his actions towards [sic] me led me to believe that had I been someone white, never would have had any question – any doubt that that would have happened to them." *Id.* 42:22–43:4. Notwithstanding Gibson's belief, this was the only time Stinnett and Gibson had an altercation, and Gibson is not aware of any other incidents involving Stinnett approaching black employees and reacting in a similar manner. *Id.* 44:13–44:17; Pl.'s Mondi Facts ¶ 51.

Gibson also had run-ins with Greg Yegohian, a member of the management team. *See* Yegohian Decl. ¶ 2, Doc. No. 97-8. Yegohian saw Gibson away from his work station and approached him. Gibson advised that he was on his way to the bathroom because he had "no

6

control . . . [of his] bowels" and "needed to go to the bathroom." Gibson Dep. 53:12–53:23. Another supervisor approached Gibson to ask the same question and told Gibson that Yegohian had asked him to look into it. Gibson then asked Horace Wright, a "union person," what the protocol was for using the restroom, and Wright said that if Gibson "need[ed] to go to the restroom, go to the restroom." *Id.* 54:20–54:24.

A second incident with Yegohian occurred when, pursuant to company policy, Gibson informed Yegohian of a quality control issue on one of the machines. *Id.* 51:3–52:5. Yegohian informed Gibson that "if [Gibson] continued to be a disruption," Gibson would "find [himself] terminated." *Id.* 67:15–67:18; *see also id.* 52:8–52:14. Gibson does not know what "disruption" Yegohian referenced; however, Gibson believes the disruption refers to his prior complaints for not receiving overtime hours. Gibson formed this belief because Yegohian had to have known about the past complaints due to the proximity of Yegohian and Hankins's offices. *Id.* 66:21–68:1. Gibson notified a company hotline that Yegohian's threat of termination created a "hostile work environment." *Id.* 57:12–58:3; 59:9–59:14.

Another incident involved Kenrick Hence, a lead-person, who told Gibson and his team to move to the sew line because the small bag line could not operate due to a lack of materials. *Id.* 63:8–63:9; 64:3–64:11. After moving to the sew line, Gibson informed Hence that his gout had flared up and that he needed to go home. Gibson was permitted to leave. After Gibson left, his team was sent back to the small bag line. *Id.* 63:14–63:22. Gibson believes this was deliberate because he is black. He states that once he went home, the

remainder of his team, which was all white, was permitted to go back to the small bags line. *Id.* 66:15–66:18. Gibson complained to Yegohian that had the team been permitted to stay on the inactive small bags line, Gibson would not have been "shortchanged" in pay caused by Gibson leaving work. *Id.* 63:19. As Gibson described it, employees who were permitted to return to the small bag line were compensated for their time. *See id.* 65:23–66:2.

Finally, Gibson had another incident with Hence when another employee was ill and the facility needed to place someone else on a twelve-hour shift. Pl.'s Mondi Facts ¶ 55; Gibson Dep. 77:1–77:11. Hence directed Gibson to fill in, but, before filling in, Gibson went to the restroom because of his diabetic condition.[2] *Id.* 78:13-78:22. After Gibson returned from the restroom, Hence instructed Gibson to leave and threatened to call the sheriff if Gibson refused. *Id.* 79:14–80:1. Gibson apologized to Hence, the two shook hands, and Gibson thought the issue was resolved. *Id.* 80:22–80:25.

The next day, Gibson met with Dwayne Handle, Yegohian and Hankins. Gibson submitted unauthenticated notes from that meeting, but he represents that those notes are Hankins's notes from that meeting. *See* Doc. No. 105-1 at 1 (identifying Attachment R as "Hankins notes of the Suspension and Termination"). In that meeting, the group discussed Gibson's interaction with Hence. Gibson advised that no one raised his voice and the Hence incident was not confrontational. Doc. No. 105-5 at 2. Yegohian reminded Gibson that he

---

[2] Gibson was later terminated and his union submitted a grievance to arbitration. According to the arbitration award, Hence instructed Gibson that he could use the restroom but he had to "tell his machine operator first." Hence also testified that Gibson said he would not go to the new machine several times and put his finger in Hence's face while saying "ain't nobody scared of you." Other employees confirmed this account. Arbitration Award 2–3, Doc. No. 97-12.

is not to disobey a directive from a supervisor, but he is expected to follow it so long as the directive is not unsafe, immoral, or illegal. Gibson could always file a grievance afterward if he felt the directive was not proper. *Id.* Yegohian advised Gibson that Gibson was suspended pending an investigation. *Id.*

On December 10, 2012, Gibson was terminated for insubordination. Gibson Dep. 85:13–85:15. He provided notes from his termination meeting on December 10, 2012, which indicated Gibson, Dwayne Randle, Nason, Louis Rothchild, Hankins, and Yegohian were present. Doc. No. 105-5 at 3. An incident report dated December 10, 2012, states that "[Gibson] refused to go to the machine when asked, became argumentative, and show[ed] threatening gestures by pointing his finger in the face of [Hence.] . . . [Gibson] has had other issues in the past with being disrespectful to authority[;] this is not the first time something like this has occurred." Doc. No. 105-4 at 24. The report is signed by a supervisor, union representative, and the plant manager, with the line for Gibson marked "refused to sign." *Id.*; *see also* Doc. No. 105-5 at 3 (meeting notes stating Gibson refused to sign). After termination, Gibson filed a grievance with the union. Gibson Dep. 100:19–109:25.

Gibson's efforts to challenge his termination failed. The union advanced Gibson's grievance to arbitration and challenged termination on the grounds that "[Gibson] was not aware that not following the instructions of a Company Lead were grounds for suspension or discharge." Arbitrator's Award 4, Doc. No. 97-12. The arbitrator found the facility had authority to immediately discharge Gibson and that there was just cause for his termination.

*Id.* at 7.  Gibson was denied unemployment benefits because of the insubordination finding, and he does not recall whether he mentioned race or other reasons for his termination when he challenged the unemployment office's determination.  *See* Gibson Dep. 112:7–113:3.

C.  <u>Allegations</u>

Gibson sued Graphic Packaging and Mondi Bags for discrimination and retaliation in violation of 42 U.S.C. § 1981.  He alleges he was victim of disparate treatment discrimination based on race when the facility failed to schedule him for overtime; that the incidents between other employees created a hostile work environment; and that his subsequent suspension and termination was in retaliation for Gibson's complaints about overtime and hostile work environment.  He believes both defendants are liable for injuries, as "[b]oth companies had an interest in eliminating [Gibson] and acted in concert with one another to do so."  Doc. No. 107 at 3.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Once the movant demonstrates there is no genuine dispute of material fact, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute that must be resolved at trial. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).  Evidence is not weighed at the summary judgment stage, *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008), and all

reasonable inferences must be drawn in a light most favorable to the non-moving party, *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007).

## III.   DISCUSSION

Defendants' motions for summary judgment are granted on Gibson's hostile work environment and retaliation claims but denied in all other respects.

### A.   Response to Summary Judgment

As an initial matter, Graphic Packaging raised valid concerns with Gibson's response to its motion for summary judgment. Graphic Packaging moved to strike portions of Gibson's responses because the argument was supported with "manufactured" facts, pointed to record evidence that did not stand for the cited proposition, or did not properly respond under the Federal and Local Rules. *See, e.g.,* Doc. No. 120 at 7. Gibson also levied accusations of discovery abuses. *See, e.g.,* Doc. No. 107 at 13 n.2 ("It is inconceivable that a [c]ompany would consistently post false company documents unless it is preparing for litigation."). Graphic Packaging's motion to strike was denied [Doc. No. 132], but not because its argument was without merit.

Gibson's responses were indeed inadequate. The problem is that these inadequate responses were also inaccurate. For example, Gibson cites to page twenty six of his own deposition in support of why some employees scheduled for an eight-hour shift might end up working a twelve-hour shift, but page twenty six contains no reference to shifts; rather, the page contains testimony about whether Gibson filed written grievances. *Compare* Pl.'s

Graphic's Facts ¶ 25 *with* Gibson Dep. 26. Gibson also raises the cursory allegation that Graphic Packaging (or someone else) fabricated documents, apparently because it anticipated litigation three-plus years after the events described herein, but Gibson provides no evidentiary basis in support. Finally, Gibson theorizes about events without citing to any evidence to support it. For example, Gibson argues that "Yeghoian [sic] used Kendric Hence to execute a plan not even two weeks later . . . that would result in Gibson's suspension and termination," yet there is no evidence of any plan or any evidence to even suggest such an inference. *See* Doc. No. 107 at 27. Indeed, the citation used to support that argument is an "id" cite to Nance's declaration, with a pagination marker not to a page or paragraph of the declaration, but to an Eighth Circuit case suggesting inferences are appropriate in summary judgment review.

Finally, Gibson also submitted his own statement of facts, apparently pursuant to Local Rule 56.1(b), which requires him to submit a "separate, *short and concise* statement of *material* facts" (emphasis added) where there is a "genuine dispute" to be tried. There is nothing "short and concise" about Gibson's 171 submitted facts, especially considering many of his submitted facts are not "material" to his claims. Among these facts are legal conclusions, such as stating Mondi Bags, Graphic Packaging and Mid-America Packaging "are all successor corporations." *See, e.g.,* Pl.'s Facts ¶ 1, Doc. No. 112. There are also facts that Gibson admitted were already undisputed, such as Gibson contacting an Alertline to report a hostile work environment. Compare Pl.'s Facts ¶ 124 *with* Pl.'s Mondi Facts ¶ 53.

He also cites to portions of his own testimony and to other record materials, but mischaracterizes the information and adds his own commentary as if the fact is true. For example, he cites to his testimony about another supervisor following up on an issue already addressed by Yegohian as Yegohian directing a known "hot head" who was "fired shortly after he was hired [to] stand watch" outside of a bathroom. Pl.'s Facts ¶ 116. Gibson has not pointed to any part of the record identifying the supervisor as a "hot head" or that the supervisor was "fired" shortly after the incident.

A plaintiff resisting summary judgment "has an affirmative burden to designate specific facts creating a triable controversy." *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir. 2004) (quotation omitted). Gibson must support his arguments with factual statements before inferences can be drawn, especially if Gibson expects inferences stretching obscure facts to suggest malicious motives such as hatching a plan to target Gibson for termination to mask racial discrimination. Gibson must pinpoint portions of the record concisely and accurately. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). "[A] district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (quotation omitted). Gibson's failure to follow the rules resulted in substantial time spent checking the accuracy of each factual and legal representation. Although Gibson received as much leeway as possible as the nonmovant, his arguments were

certainly hindered by his inability to support many of his assertions with evidence to demonstrate a material fact for trial.

B.     Discussion of Claims

All of Gibson's claims fall under section 1981, which provides, in pertinent part, that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. The statute is not a general anti-discrimination statute, but rather one requiring equal treatment when tied to some contractual relationship. *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2011). Thus, the statute "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment, and is applicable to a plaintiff complaining of discrimination during . . . employment . . . ." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). Even in states where employees are at-will employees, as is the case here, section 1981 prohibits discrimination in employment. *See Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 759 (8th Cir. 2002).

Gibson has not presented direct evidence of discrimination, so the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973), applies. *Jin Ku Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997) (section 1981 claims use same framework as Title VII); *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030–31 (8th Cir. 2013) (retaliation claims); *Jones v. Forrest City Grocery, Inc.*, Case No.

4:06-CV-00944 BSM, 2008 U.S. Dist. LEXIS 123577, at *9 (E.D. Ark. June 26, 2008). Under this framework, Gibson must first establish a prima facie case; if a prima facie case is established, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the challenged action; and if the defendant proffers a reason, the burden shifts back to Gibson to establish that the proffered reason is mere pretext for discriminatory animus. *Jin Ku Kim*, 123 F.3d at 1056; *Harris v. Hays*, 452 F.3d 714, 717 (8th Cir. 2006).

### 1. Disparate Treatment

Defendants' motions for summary judgment on Gibson's disparate treatment claim are denied because there is a genuine issue of material fact.

Gibson's complaint is that he was denied overtime shifts through the facility's disparate treatment against him because he is black. A prima facie case for disparate treatment requires a showing that (1) Gibson is a member of a protected class; (2) that he was meeting his employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently. *Smith v. URS Corp.*, 803 F.3d 964, 969 (8th Cir. 2015).

Although Gibson's case is certainly lacking, he established a prima facie case. Aside from showing he is a member of a protected class as a black man, Gibson must rely on inferences to satisfy the remaining factors. An inference exists, for example, that he suffered an adverse employment action when he did not receive an opportunity to work overtime hours to earn additional income. *See, e.g., Little v. NBC*, 210 F. Supp. 2d 330, 379 (S.D.N.Y.

2002) (question of fact whether an actual loss in income and erratic work schedule is adverse employment action). An inference also exists that he met his employer's job expectations because he was often scheduled for overtime shifts after complaining about not receiving them. *See, e.g.,* Gibson Dep. 35:1–35:4. Finally, McGath and Braswell, two white men who presumably would not qualify for overtime hours before Gibson, were scheduled for overtime instead, demonstrating the facility's willingness to treat white workers differently. This inference is reasonable considering Gibson's observations that only black employees routinely operated the eight-hour machines. *See id.* 119:9–120:11.

Assuming Gibson has a prima facie case, there is a dispute of fact on whether there are nondiscriminatory reasons for the scheduling. As best one can tell from the record, the parties agree that the seniority policy dictated scheduling workers on machines; however, neither defendant explained why Gibson's seniority did not earn him overtime shifts when McGath's and Braswell's lower seniority earned them scheduled overtime. Again, Gibson benefits from great inferences here, but on this record, summary judgment is not appropriate.

Accordingly, defendants' motions for summary judgment on the disparate treatment claims are denied.

### 2. Hostile Work Environment

The motion for summary judgment on Gibson's hostile work environment claim is granted.

A hostile work environment occurs when "the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted); *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194 (8th Cir. 2006). Gibson's prima facie case requires proof that he (1) is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) there is a causal nexus between the harassment and his protected group; and (4) the harassment affected a term, condition, or privilege of employment. *Beard v. Flying J, Inc.*, 266 F.3d 792, 797 (8th Cir. 2001).

Gibson's claim fails because he cannot make out a prima facie case. Gibson's amended complaint focuses on his incident with Stinnett as creating a hostile work environment, but his deposition (and defendants' argument) suggests he also believes Yegohian threatening him with his job did as well. *See* Am. Compl. ¶¶ 42–48; Gibson Dep. 38:8–38:10; 57:12–58:3; 59:9–59:14; 123:17–123:24. After exhaustive review of the record, it is clear that these incidents did not even arguably involve Gibson's race. *See Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (conduct amounting to hostile work environment must be "based on the plaintiff's . . . race"). Gibson's belief that others made racial comments to him – but his inability to remember any, Gibson Dep. 102:14–102:23 – and his belief that someone's mannerisms or actions, *id.* 42:3; 103:1, suggest racial hostility is far short of the instances of a hostile work environment actionable under employment discrimination statutes. *See e.g., Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130

F.3d 349, 352–54 (8th Cir. 1997) (constructive discharge occurred after "a steady barrage of racial name-calling at the [defendant's] facility"); *Ways v. City of Lincoln*, 871 F.2d 750, 754–55 (8th Cir. 1989) (over fifty examples of racial harassment).

Moreover, these incidents are separate and distinct. The Stinnett and Yegohian incidents were nearly nine months apart and even if racial undertones are implied, represent only three examples of racial hostility. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) ("A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents."). While Gibson's characterizations of the interactions as "hostile" is understandable, short tempers or intense arguments on their own do not create a racially hostile work environment. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80–82 (1998) (cautioning Title VII is not a "general civility code" to regulate workplace dynamics). Rather, "[m]ore than a few isolated incidents of harassment must have occurred." *Johnson v. Bunny Brad Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981); *see also Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) ("offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment").

Finally, even if Gibson could overcome these deficiencies, the events are not sufficiently serious and pervasive. A hostile work environment considers factors such as "whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it

unreasonably interfered with the employee's work performance." *Nitsch v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006). Assuming Gibson's interaction with Stinnett was "severe" because Compton had to pull Stinnett away to keep "Stinnett from attacking [Gibson,]" Gibson Dep. 39:10, there is no evidence suggesting this type of interaction was frequent at the facility. Gibson points to only three incidents during the years he worked at Graphic Packaging that support his hostile work environment claim, and two of those incidents involved no physical aggression and were with a different person. Moreover, there is no evidence that Gibson's performance at work was affected, as the stress and health issues he describes stemmed from his termination and not the incidents comprising the hostile work environment. *See, e.g.,* Gibson Dep. 14:15–14:23; 94:12–94:20; 98:7–98:11.

Accordingly, Gibson's hostile work environment claim is dismissed.

### 3. Retaliation

The motion for summary judgment on Gibson's retaliation claim is granted because Gibson's termination was not caused by complaints of protected behavior.

Gibson alleges retaliation when (1) he was suspended pending an investigation; (2) when he was terminated; and (3) when the facility provided misleading testimony when combating Gibson's claim for unemployment benefits. Am. Compl. ¶¶ 80–110. A retaliation claim under section 1981 requires showing (1) Gibson engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) there was a causal connection

between the two.  *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030–31 (8th Cir. 2013).

Gibson's claim fails because he cannot establish a prima facie case for retaliation. First, there is no protected activity because Gibson's complaints about overtime and a hostile work environment were not focused on race discrimination as prohibited by section 1981, but rather the facility not following an overtime policy and supervisors threatening termination.  *See Moschetti v. Chicago, Cent. & Pac. R.R.*, 119 F.3d 707, 709 (8th Cir. 1997) (retaliation occurs when employee opposes practices prohibited by the statute).

Second, there is a lack of causation and pretext.  Gibson's theory is that the culmination of various events over a three year period caused his sudden suspension and termination.  Causation, however, requires a showing that the employer's actions were the "but-for cause of" his suspension or termination – that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [facility]." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737–38 (8th Cir. 2013) (quotation omitted). Here, Gibson was suspended and terminated as a result of insubordination, which was a violation of his employer's rules, which Gibson has already unsuccessfully challenged (albeit, on grounds unrelated to race).  *See, e.g., Walker v. Norris Cylinder Co.*, 2005 U.S. Dist. LEXIS 20465, *16 (N.D. Tex. Sept. 19, 2005) ("An employee's violation of a company work rule is a legitimate, nondiscriminatory reason for discharging him.").  While Gibson might disagree, "employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the

business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Vaughn v. Roadway Express, Inc.*, 164 F.3d 1087, 1091 (8th Cir. 1998). This record simply does not support any reasonable inference that Gibson's prior workplace complaints led to defendants' subsequent action, and there is certainly no evidence to suggest terminating for insubordination was pretext for discriminatory behavior.

Accordingly, Gibson's retaliation claim is dismissed.

D.     Successor Liability

Defendants' motions for summary judgment on successor liability are denied because there are genuine questions of material fact on whether Mondi Bags acquired the liability.

Gibson brought suit against Graphic Packaging, the owner of the facility during the events at issue here, and Mondi Bags, the subsequent owner. Am. Compl. ¶¶ 4–6. Although Gibson argues that Mondi Bags is liable for his claims under a theory of successor liability, he also maintains that "both [companies] are liable for his injuries." Doc. No. 107 at 3. In turn, defendants each point to each other as liable for the injuries – Graphic Packaging points to Mondi Bags because Graphic Packaging "sold all of its interests in the [facility]" to Mondi Bags in June 2014, and Mondi Bags argues that Mondi Bags does not have successor liability and the claim remains with Graphic Packaging. *See* Doc. No. 98 at 14; Doc. No. 94-1 at 8–9. Although Gibson does not explain how both companies can simultaneously be liable, the defendants' motions are denied because questions of material fact remain.

Whether liability remains with Graphic Packaging or is transferred to Mondi Bags

turns on the common law doctrine of successor liability. Successor liability is an equitable determination requiring careful balancing of multiple factors. *Prince v. Kids Ark Learning Ctr., LLC*, 662 F.3d 992, 994 (8th Cir. 2010). Although not an exhaustive list of factors, the leading approach stems from the Sixth Circuit Court of Appeals, which pointed to nine: (1) whether the successor had notice of plaintiff's charges; (2) the ability for the predecessor to provide relief; (3) whether there has been a substantial continuation of business operations; (4) whether the new employer uses the same facility; (5) whether the new employer uses the same work force; (6) whether the new employer uses the same supervisors; (7) the similarity of jobs and working conditions; (8) whether equipment and production processes are the same; and (9) similarity between products produced. *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974). Successor liability must balance "preventing wrongdoers from escaping liability and . . . facilitating the transfer of corporate assets to their most valuable uses." *Nutt v. Kees*, 796 F.3d 988, 991 (8th Cir. 2015).

Assuming Gibson has a claim for discrimination, there are unresolved questions on whether Graphic Packaging or Mondi Bags should be liable. For example, counsel for Mondi Bags repeatedly refers to Gibson working for Mondi Bags (and not Graphic Packaging) when discussing the events at Gibson's deposition, which makes sense considering the continuation of work after the company sale at the facility, similar workflow, and some consistent management. *See, e.g.,* Gibson Dep. 9:18–19 (counsel for Mondi asking, "What is – can you recall the job you held before coming to Mondi?"); Pl.'s Mondi

Facts ¶ 7 (agreement that Yegohian was a manager for Graphic Packaging and is now a member of Mondi Bags's management). There remains a question, however, of whether Mondi Bags would have had any reason to know that Gibson had a race discrimination claim and if so, whether Graphic Packaging could be held liable. As discussed throughout this order, there are serious questions about whether Gibson actually voiced a complaint based on race or simply challenged application of the seniority policy. Furthermore, Mondi Bags's involvement in the post-termination arbitration proceedings was limited to Gibson's challenges on whether his "discharge was 'unjust' because [Gibson] was not aware that not following the instructions of a Company Lead were grounds for suspension or discharge." Arbitration Award 4. Considering factors such as Mondi Bags's notice of the claim against Graphic Packaging and if Graphic Packaging is able to provide the relief requested is "critical" to this decision, *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986), a trial on the merits must flush out this fact-intensive inquiry.

The only way to protect Gibson's claims and to guard against unfair treatment against either defendant is to allow all parties to present their evidence. After hearing the evidence and evaluating the witnesses, a proper decision on successor liability can be made.

IV.    CONCLUSION

For the aforementioned reasons, defendants' motions for summary judgment [Doc. No. 94, 97] are granted with respect to Gibson's retaliation and hostile work environment claims but denied in all other respects.

IT IS SO ORDERED this 10th day of August 2017.

_____
UNITED STATES DISTRICT JUDGE